UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
JANE DOE,

                           Plaintiff,

               -against-

ALEX TRIPODI, CITY OF NEW YORK, NEW YORK
DEPARTMENT OF EDUCATION, and CHANCELLOR
DAVID C. BANKS *in his official capacity*,


                         Defendants.
----------------------------------------------------------------x

**MEMORANDUM AND ORDER**
22-CV-07773 (OEM) (RML)

ORELIA E. MERCHANT, United States District Judge:

Plaintiff Jane Doe ("Plaintiff") brings this action against defendants Alex Tripodi ("Tripodi"), the City of New York ("City"), Chancellor Melissa Aviles-Ramos in her official capacity ("Chancellor"),[1] and the New York City Department of Education ("NYC DOE") (Chancellor, City, and NYC DOE referred to collectively as "City Defendants"), asserting claims pursuant to 20 U.S.C. §§ 1681 *et seq.* ("Title IX") under 42 U.S.C. § 1983 ("Section 1983"). *See generally* Amended Complaint for Damages and Demand for Jury Trial, Dkt. 52 ("Amended Complaint" or "Am. Compl."). Plaintiff alleges that Tripodi engaged in numerous acts of sexual violence and gender-based violence against her, which City Defendants failed to appropriately investigate and address. *See generally id.* Before the Court is the City Defendants' motion to dismiss all of Plaintiff's claims alleged against City Defendants.[2] For the following reasons, the City Defendants' Motion is granted in part and denied in part.

---

[1] The previous chancellor, David C. Banks, was named as a defendant in his official capacity and, pursuant to Federal Rule of Civil Procedure 25(d), his successor is automatically substituted as a party.

[2] *See* Memorandum of Law in Support of the DOE Defendants' Motion to Dismiss the Amended Complaint, Dkt. 61 ("Motion" or "Mot."); Plaintiff's Brief in Opposition to City of New York Defendants' Motion to Dismiss, Dkt. 62

This action arises out of the "dating" relationship between Plaintiff and Tripodi, from January 2020 to spring 2021, when both Plaintiff and Tripoli were students at Brooklyn Technical High School ("Brooklyn Tech"). Am. Compl. ¶¶ 39, 51; Mot. at 1. Plaintiff alleges Tripodi "controlled and surveilled" her, requiring that she share her social media and device passwords "so that Tripodi could monitor her location and her activities" and threatened her if she attempted to stand up to him. Am. Compl. ¶ 40. She also alleges that he physically threatened her on at least two occasions. *Id.* ¶ 42. According to Plaintiff, when school transitioned online due to the COVID-19 pandemic, Tripodi became increasingly controlling by coercing Plaintiff into producing child sex abuse material ("CSAM") on demand. *Id.* ¶ 44. She further alleges that Tripodi threatened to disseminate the CSAM photos and videos if she did not comply with his demands, and manipulated her with verbal abuse and claims that she was a liar and misbehaving. *Id.* ¶¶ 44-48. Plaintiff broke up with Tripodi in late spring 2021. *Id.* ¶ 51.

When Brooklyn Tech returned to in-person learning in September 2021, Plaintiff reached out to her guidance counselor, Lauren Williams ("Williams"), expressing concern that she was in the same statistics class as Tripodi and reported that he had "emotionally, verbally, and sexually abused her." *Id.* ¶ 52. Williams changed Plaintiff's schedule but "did not report the sexual abuse allegation" or "take any steps to report [the] abuse to school leaders to initiate an investigation." *Id.* ¶ 53. During the first week of October 2021, the Brooklyn Tech dean, Christian Clarke, ("Clarke") asked Plaintiff "to provide him with evidence that Tripodi had coerced [her] into

---

("Opposition" or "Opp'n"); Reply Memorandum of Law in Further Support of the DOE Defendants' Motion to Dismiss the Amended Complaint, Dkt. 63 ("Reply").

[3] The following facts taken from Plaintiff's Amended Complaint are accepted as true for the purposes of City Defendants' Motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

producing naked images of herself." *Id.* ¶ 56. Plaintiff complied by sharing screenshots of her "explicit text messages" with Tripodi. *Id.* ¶ 57. Clarke informed Plaintiff and her parents that he had interviewed Tripodi. *Id.*¶ 59. He said that Tripodi did not deny Plaintiff's allegations and had written Plaintiff an apology letter, which she was given to read alone in a room with Clarke, but not allowed to keep. *Id.* Clarke informed Plaintiff that "he had personally supervised and witnessed Tripodi deleting the CSAM depicting [Plaintiff] from his (Tripodi's) phone." *Id.* ¶ 60.

Tripodi was arrested by NYPD Special Victims officers and put on juvenile probation under the supervision of the New York City Department of Corrections. *Id.* ¶ 64. Before Brooklyn Tech's investigation, Plaintiff's friends spoke out about Tripodi's abusive conduct and behavior and Tripodi "began lashing out publicly against [Plaintiff]" by publishing a statement to his public social media account maligning Plaintiff and defending his conduct. *Id.* ¶ 66. Graffiti disparaging Tripodi appeared in the boys' bathroom and in the hallways. *Id.* ¶¶ 67-68. As a result, "school officials communicated to [Plaintiff] that she was somehow responsible for the conduct being directed at Tripodi by other students." *Id.* ¶ 70. Many of Plaintiff's friends were investigated and disciplined for calling out Tripodi for his public statement. *Id.* ¶ 71. These events caused Plaintiff "significant distress," and she became unable to attend class and complete academic tasks, dissociated while in class, and avoided areas of campus where Tripodi was or might be. *Id.* ¶¶ 72-74. Plaintiff avers that Brooklyn Tech was aware of what she was experiencing "because Williams offered to write [Plaintiff] notes to excuse her from class when she felt too emotionally distressed to attend." *Id.* ¶ 75. Clarke advised Plaintiff's father that "he would have liked to suspend Tripodi, but that it was not [NYC DOE's] custom to suspend students in this type of situation." *Id.* ¶ 77. When Plaintiff's father asked how Plaintiff could stop encountering her abuser at school, Clarke informed him that "there was nothing Brooklyn Tech school leaders could do to protect [Plaintiff],

and that the only option for keeping her safe, per [NYC DOE] policy was for [Plaintiff] to transfer to a different school." *Id.* ¶ 78 (emphasis omitted). Plaintiff titles this procedure the "Victim Transfer Policy." *Id.* ¶¶ 6, 78.

Plaintiff alleges that "[a]s a result of the school's inaction in protecting her while at school and while taking part in school activities, [she] suffered significant distress[] . . . anxiety, hopelessness, sleeplessness, inability to eat, and inability to focus on academic or personal tasks." *Id.* ¶ 86. Additionally, "[a]s a result of the school's retaliation toward [her], by blaming her and making her responsible for other students' conduct towards Tripodi – she suffered significant distress." *Id.* ¶ 87. Her grades dropped, her educational prospects fell into jeopardy, and she alleges that she "was deprived of the educational opportunities she was entitled to." *Id.* ¶¶ 88-89. Plaintiff has since been diagnosed with post-traumatic stress disorder ("PTSD") and receives trauma-focused therapy treatment for her symptoms. *Id.* ¶ 90.

Plaintiff further alleges that four other incidents occurred in the New York City public school system between 2015 and 2023, wherein the NYC DOE used the purported Victim Transfer Policy to respond to student-on-student sexual violence alleged by female students. *Id.* ¶¶ 8-11. In the first scenario, the alleged victim was instructed "to stop attending school" after the school became aware of the harassment. *Id.* ¶ 8. In the second scenario, the alleged victim's parents "were told that if they did not want [the victim] at the same school as her assailant, their only options were to home school [the victim] or to transfer her to an Intermediate School." *Id.* ¶ 9. In the third scenario, the alleged victim was placed on suspension and forced to attend a suspension school and then transferred to a different school without her consent. *Id.* ¶ 10. In the fourth scenario, the alleged victim was "told by school leaders that, if she felt unsafe being in school with her classmate-rapist, she needed to enroll in home school or transfer to a different school." *Id.*

¶ 11. In each of the foregoing incidents, the alleged victims reported their abuse to their respective school officials or administrators. *Id.* ¶¶ 8-11.

On December 7, 2023, City Defendants moved to dismiss Plaintiff's Complaint, *see* Memorandum of Law in Support of DOE's Motion to Dismiss, Dkt. 31 ("First Motion to Dismiss"), which this Court granted in part and denied in part, Memorandum and Order, Dkt. 37 ("Memorandum and Order" or "M&O"). The Court determined that Plaintiff adequately pled a Title IX claim and denied the City Defendants' motion to dismiss Plaintiff's Title IX claims. *Id.* at 8. The Court also determined that her allegations concerning other lawsuits complaining of NYC DOE's purported use of the Victim Transfer Policy were "insufficiently specific and substantial to adequately plead a municipal policy." *Id.* at 11. As a result, the Court dismissed Plaintiff's Section 1983 claim for failure to adequately plead liability under *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658 (1978). *Id.* The Court subsequently granted Plaintiff leave to amend her complaint, and she filed her Amended Complaint on May 19, 2025. *See generally* Am. Compl.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). In evaluating a Rule 12(b)(6) motion to dismiss,

the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

**DISCUSSION**

Plaintiff asserts three claims against City Defendants. She alleges that the City Defendants[4] violated: 1) her rights under the Due Process clause of the Fourteenth Amendment of the U.S. Constitution ("Fourteenth Amendment") and Title IX, Am. Compl. ¶¶ 118-23 ("Seventh Cause of Action"), 2) Title IX by acting with deliberate indifference, *id.* ¶¶ 124-28 ("Eighth Cause of Action"), and 3) Title IX by creating a hostile educational environment for Plaintiff, *id.* ¶¶ 129-32 ("Ninth Cause of Action").

City Defendants move to dismiss the Seventh, Eighth, and Ninth Causes of Action under Rule 12(b)(6). First, City Defendants argue that Plaintiff's Eighth Cause of Action, arising under Section 1983 and a *Monell* theory of liability, fails as a matter of law. Mot. at 6-13. Second, City Defendants argue that the City is not a proper defendant and move to dismiss all claims against it. *Id.* at 13-14. Third, City Defendants argue that her Eighth and Ninth Causes of Action under Title IX are subsumed by her Section 1983 claim and should be dismissed. *Id.* at 2. The Court addresses each argument in turn.

**A. Municipal Liability**

Under Section 1983 and *Monell*, Plaintiff alleges that NYC DOE and the Chancellor, "have failed to implement procedures and policies that protect access to education afforded to female students after they are victims of student-on-student sexual violence" and "have created and implemented an unlawful *de facto* policy of offering victims of sexual and gender-based violence

---

[4] Plaintiff asserts her seventh and eighth causes of action "against the City of New York," but she only alleges violations by NYC DOE and the Chancellor. *See* Am. Compl. ¶¶ 118-28.

the choice between attending school with their assailants or transferring to a different school," which directly harms female students by forcing them to "accept educational deprivation as an inevitable outcome of their status" as victims. Am. Compl. ¶¶ 121-23.

Municipalities are liable only where "execution of a government's policy or custom" causes a constitutional violation. *Monell*, 436 U.S. at 694. To establish liability under *Monell*, a plaintiff "must allege facts demonstrating (1) the existence of an officially-adopted 'policy, custom, or practice' and (2) a direct and deliberate causal connection between that 'policy, custom, or practice' and the violation of plaintiff's federally-protected rights." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-04 (1997)). City Defendants challenge Plaintiff's pleading of the first prong. *See* Mot. at 7-10.[5] A plaintiff may satisfy this prong by alleging:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 538-39 (S.D.N.Y. 2015) (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)); *see also Pangburn v. Culbertson*, 200 F.3d 65, 71-72 (2d Cir. 1999). The Court analyzes whether Plaintiff plausibly

---

[5] As to a causal connection between a policy and Plaintiff's federally-protected rights, City Defendants appear to argue that Plaintiff's claims are limited to Due Process Clause theories, not the Equal Protection Clause. Mot. at 6 n.2. The Court draws all reasonable inferences in favor of Plaintiff and acknowledges that she alleges that the NYC DOE's policies "disparately impact her based on her sex," that NYC DOE "failed to implement procedures and policies that protect access to education afforded to female students," and that NYC DOE's policies "directly harm female students," Am. Compl. ¶¶ 119, 121, 123, which favors a theory of constitutional deprivations under the Equal Protection Clause.

asserts the third or fourth categories; in other words, a widespread practice or failure to train. *See* Am. Compl. ¶¶ 118-23.

### 1. Widespread Practice

City Defendants argue that Plaintiff's reference to four other instances in which the Victim Transfer Policy was allegedly applied in New York public schools are not widespread enough to satisfy *Monell* liability and are factually inapposite. Mot. at 11-12. Plaintiff responds that her allegations support a finding that the Victim Transfer Policy was "so manifest as to imply the constructive acquiescence of senior policy-making officials." Opp'n at 4 (citing *Perkins v. City of Rochester*, 641 F. Supp. 2d 168, 172 (W.D.N.Y. 2009)).

To plausibly allege a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware, a "[p]laintiff must allege 'that the relevant practice is so widespread as to have the force of law.'" *Kucharczyk*, 95 F. Supp. 3d at 544 (quoting *Brown*, 520 U.S. at 404); *see Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). "[T]here must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.'" *Choudhury v. NYC Health & Hosps. Corp.*, 25 Civ. 5240 (PAE), 2026 WL 322956, at *12 (S.D.N.Y. Feb. 6, 2026) (quoting *Lucente v. County of Suffolk*, 980 F.3d 284, 298 (2d Cir. 2020)). At that point, "the unconstitutional conduct is so persistent and widespread that it can constitute a custom or usage of which a supervising policymaker must have been aware." *Id.* (quoting *Lucente*, 980 F. 3d at 298). "[T]he mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993).

Here, Plaintiff does not sufficiently allege a widespread practice. In addition to her own experience, Plaintiff relies on four other instances in the New York City public school system between 2015 and 2023 where the Victim Transfer Policy was allegedly implemented. Am. Compl. ¶¶ 8-11. First, the occurrence of five instances over the course of eight years is insufficiently prevalent and more isolated in nature. *See Pettiford v. City of Yonkers*, 14 Civ. 6271 (JCM), 2021 WL 2556172, at *12 (S.D.N.Y. June 21, 2021) ("Pleadings articulating only isolated instances of unconstitutional behavior do not plausibly allege a well-settled custom." (citing *Fowler v. City of New York*, 13-CV-2372(KAM)(ST), 2019 WL 1368994, at *9 (E.D.N.Y. Mar. 26, 2019), *aff'd*, 807 F. App'x 137 (2d Cir. 2020))); *Douglas v. City of Peekskill*, 21-CV-10644 (KMK), 2023 WL 2632217, at *8-9 (S.D.N.Y. Mar. 24, 2023) (collecting cases and determining that six alleged *Brady* violations over the course of twenty years was insufficient to plausibly allege a well-settled custom); *White v. City of New York*, 206 F. Supp. 3d 920, 938 (S.D.N.Y. 2016) (six "dissimilar incidents" over the course of five years were insufficient to render the allegations of the existence of a policy of abuse towards transgender persons plausible); *cf. Jones*, 691 F.3d at 85 (where two to three instances over a period of several years perpetuated by a small number of officers was insufficient to establish *Monell* liability); *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (where four examples over an unspecified time period fell "far short of establishing a practice that is 'so "persistent" or "widespread"' as to justify the imposition of municipal liability" (quoting *Patterson*, 375 F.3d at 226)).[6]

---

[6] Plaintiff argues that she provides more detailed facts and context of the Victim Transfer Policy than the plaintiff did in *Giaccio*. *See* Opp'n at 5-6. However, in *Giaccio*, the Second Circuit's reasoning was not dependent on whether the plaintiff posed a bare-bones allegation that lacked facts or context; rather the court determined that there was no *Monell* liability because four examples were insufficient to establish a "persistent or widespread" practice. *Giaccio*, 308 F. App'x at 472 (quoting *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006)). Ultimately, regardless of the detail Plaintiff provided for the four purportedly analogous cases, the lack of prevalence is detrimental to the plausibility of a widespread practice.

Further, Plaintiff does not allege the total number of instances of sexual or gender-based violence complained of by female students in the same time period. Plaintiff argues that the four other instances "are specific instances of specific circumstances triggering a specific response against a specific class of students." Opp'n at 6-7. Although Plaintiff provides the context for each incident, and there appear to be some similarities between Plaintiff's experience and at least three of the other incidents, the Court cannot "evaluate the significance of," nor infer widespread conduct from, the five other alleged uses of the Victim Transfer Policy in a vacuum. *See Joseph v. Doe*, 16-CV-2004 (PKC) (LB), 2017 WL 4233024, at \*5 (E.D.N.Y. Sep. 22, 2017) (where the plaintiff did not allege the total number of searches conducted by the NYPD in the same time period, the court could not properly evaluate the significance of the three unlawful entry and searches that the plaintiff cited as indicative of a pattern); *DiPippo v. County of Putnam*, 17-cv-7948 (NSR), 2019 WL 1004152, at \*9 (S.D.N.Y. Feb. 28, 2019) (explaining that a *Monell* claim based on a widespread policy "must be context-specific and cannot be reduced to an overly simplistic analysis of the number of instances alleged . . . it must be based on the number of instances alleged *relative to the size* of the county's sheriff department and relative to the time frame at issue"). In other words, without a fuller picture of instances where the Victim Transfer Policy could have been implemented, but was not, there are insufficient facts pled to indicate a pattern of widespread conduct of which policymakers had to have been aware.

City Defendants argue that "the four would-be comparator incidents highlighted by Plaintiff are inapposite." Mot. at 11. Plaintiff does not respond to this argument. *See generally* Opp'n. The Court agrees that at least one of the four alleged incidents is inapposite to Plaintiff's self-described "Victim Transfer Policy," which further reduces the plausibility of a pattern of widespread conduct. As alleged, the Victim Transfer Policy involves "offering victims of sexual

and gender-based violence the choice between attending school with their assailants or transferring to a different school." Am. Compl. ¶ 122. In the first scenario, the victim was instructed to stop attending school, which is not the same as being given the choice to transfer schools or continue attending the same school as her abuser. *Id.* ¶ 8; *see White*, 206 F. Supp. 3d at 938 (factoring in the dissimilar characteristics of the alleged incidents and holding that there was no plausibly alleged widespread practice); *cf. Pluma v. City of New York*, 13 Civ.2017(LAP), 2015 WL 1623828, at *12 (S.D.N.Y. Mar. 31, 2015).

Plaintiff asserts that the Amended Complaint is well-plead; "[d]iscovery could reveal dozens or even hundreds of instances where female student-victims were subjected to the victims transfer policy." Opp'n at 8 (emphasis omitted). But beyond Plaintiff's allegations of analogous incidents, Plaintiff does not sufficiently allege facts to circumstantially support her argument that policymaking officials constructively acquiesced to the implementation of the Victim Transfer Policy. *See DiPippo*, 2019 WL 1004152, at *9 ("The court's main concern, after all, is to vet credible claims and ensure that a plaintiff has pleaded enough facts to show that a county was *aware* of pattern or custom and acquiesced to unconstitutional conduct."); *Buari v. City of New York*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) ("To demonstrate a *de facto* policy or custom through a widespread practice, a plaintiff must 'show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'" (quoting *Amnesty Am.*, 361 F.3d 113, 126 (2d Cir. 2004))). By nature, the lack of a widespread practice diminishes the plausibility that senior policy-making officials knew of, and thereby constructively acquiesced to, the Victim Transfer Policy. Additionally, Plaintiff alleges that Clarke responded to Plaintiff's fear of encountering Tripodi at school by stating there was nothing Brooklyn Tech school leaders could do and "the only option for keeping her safe per [NYC

11

DOE] policy, was for [her] to transfer to a different school." Am. Compl. ¶ 78. This permits an inference that Clarke was aware of the Victim Transfer Policy. However, as City Defendants point out, Mot. at 12, Plaintiff has not plausibly alleged that Clarke has policymaking authority such that his statements are relevant for *Monell* purposes, *see, e.g.*, *Hu v. City of New York,* 927 F.3d 81, 106 (2d Cir. 2019) (reasoning that there were no factual allegations to conclude that the assistant chief inspector's remarks "were made 'with sufficient frequency or in such a manner that the attitude would have been known to supervisory personnel'" or to suggest that he "communicated this attitude directly to senior policymaking officers or in a manner that should have made senior policymaking officers aware of his discriminatory animus" (quoting *Jones*, 691 F.3d at 82)); *Choudhury*, 2026 WL 322956, at *13 (determining that the plaintiff failed to allege actual or constructive awareness of the alleged discrimination because she did "not allege that her complaints reached senior officials with policymaking authority"). *Contra Chislett v. N.Y.C. Dep't of Educ.*, 157 F.4th 172, 192 (2d Cir. 2025) (facts supported municipal liability where plaintiff complained to senior officials, who conveyed complaints to the NYC DOE chancellor). Even assuming Clarke and the NYC DOE officials in the other three factually similar instances had policymaking authority, showing only four examples still falls short of a widespread practice.

Finally, Plaintiff does not identify whether any of the victims in the four other scenarios complained of the Victim Transfer Policy itself and likewise fails to indicate whether senior policymakers were faced with the Victim Transfer Policy's existence in a way that their purported failure to address the policy constituted a constructive acquiescence. *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("The inference that a policy existed may, however, be drawn from circumstantial proof, such as evidence . . . that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used

excessive force in violation of the complainants' civil rights." (citing *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986))); *Douglas*, 2023 WL 2632217, at *9 (finding that the plaintiff failed to allege that the defendant was faced with a pattern of misconduct that would compel "the conclusion that its failure to institute an information sharing system constitutes tacit authorization of the unlawful actions"); *Anderson v. City of Mount Vernon*, 23 Civ. 3963 (NSR), 2024 WL 2158390, at *8 (S.D.N.Y. May 13, 2024) (where the plaintiff failed to allege whether the complaints were investigated or if the defendant failed to make any meaningful investigation into the complaints); *Choudhury*, 2026 WL 322956, at *13 (collecting cases and concluding that the plaintiff did not allege that her complaints reached senior officials with policymaking authority).

Consequently, Plaintiff fails to plausibly allege a *Monell* theory of liability based on a widespread practice.

### 2. Failure to Train

City Defendants argue that, to the extent that Plaintiff alleges that City Defendants failed to protect her from harassment[7] or to train staff to ensure female students' protection, these claims are not adequately plead. Mot. at 7-8; Reply at 5. Plaintiff does not directly respond to this argument in her Opposition. *See* Opp'n at 4.

A failure-to-train theory of *Monell* liability may arise from a city policy if, "in light of the duties assigned to specific officers or employees the need for more or different training is so

---

[7] City Defendants assert that a failure-to-protect claim is not a cognizable claim under the Due Process Clause of the U.S. Constitution. Mot. at 7. Plaintiff does not respond or clarify whether she asserts a failure to protect claim. The Court agrees that a failure to protect an individual against private violence does not constitute a violation of the Due Process Clause, *Faccio v. Eggleston*, 1:10–CV–783 (Lead), 1:10–CV–699 (Member), 2011 WL 3666588, at *13 (N.D.N.Y. Aug. 22, 2011) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)), and the Court declines to analyze whether it constitutes a violation of the Equal Protection Clause at this time. The Court analyzes Plaintiff's allegation that the NYC DOE and Chancellor "failed to implement procedures and policies that protect access to education" under a failure to train theory. *See* Compl. ¶ 121; *see also* Opp'n at 4 (arguing that a municipal policy, custom, or practice may be inferred where the municipality "so failed to train its employees").

13

obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). Thus, a failure to train or a failure to supervise theory of *Monell* liability requires a showing of deliberate indifference. *See Buari*, 530 F. Supp. 3d at 399 (S.D.N.Y. 2021) (citing *Amnesty Am.*, 361 F.3d at 127). To establish deliberate indifference, a plaintiff must show (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation;" (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;" and (3) "that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (first quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989); and then citing *id.* at 390). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

Here, Plaintiff has not sufficiently alleged facts that support a finding of deliberate indifference. Plaintiff's claim fails on the first element because she does not allege circumstances indicating that policymakers knew of the Victim Transfer Policy or the gender and sexual violence that resulted in its implementation. "[T]he plaintiff must show that the need for more or better protocols or supervision to protect against constitutional violations was obvious, such that it amounts to a deliberate choice by the municipality." *Clarke v. Antonini*, 21 Civ. 1877 (NSR), 2022 WL 4387357, at *12 (S.D.N.Y. Sep. 22, 2022) (citing *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). Even drawing all reasonable inferences in Plaintiff's favor, Plaintiff does not connect the five previous instances where the Victim Transfer Policy was allegedly

implemented to policymakers in a way that shows they knew to a moral certainty that their employees would encounter student-on-student sexual violence or that the Victim Transfer Policy was being implemented. The limited recurrence of the incidents over an eight-year period and nature of the incidents does not make the conduct obvious to policymakers. *Contra Harris*, 489 U.S. at 390 n.10 (explaining that city policymakers know "to a moral certainty" that police officers will be required to arrest fleeing felons and armed its officers with firearms to accomplish this task, so the need to train officers on the constitutional limitations of the use of deadly force is "so obvious" that failure to do so would be a deliberate indifference to constitutional rights).

Furthermore, while Plaintiff alleges that in the five scenarios, the female students complained of the alleged sexual harassment and violence to NYC DOE employees, Am. Compl. ¶¶ 8-11, 52, Plaintiff does not allege that this information was made known to policymakers. *See Vann*, 72 F.3d at 1049 ("An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."). Similarly, Plaintiff does not allege that the victims complained of the Victim Transfer Policy itself such that City Defendants could have plausibly been put on notice that NYC DOE employees were "mishandling" the situations. Although Plaintiff alleges that the Chancellor "is . . . responsible for addressing and correcting the absence of any needed policies, practices, and/or training within the [NYC DOE]," Am. Compl. ¶ 38, this allegation fails to indicate that the Chancellor knew of the instances of sexual and gender violence or allegedly repeated employment of the Victim Transfer Policy by NYC DOE schools, *see Clarke*, 2022 WL 4387357, at *12 (noting that the plaintiff plausibly alleged "a history of employees mishandling the situation" but did not identify which policymakers from either municipality knew about the alleged history of employees

mishandling the situation). Plaintiff also alleges that Clarke responded to Plaintiff's fear of encountering Tripodi at school by stating there was nothing Brooklyn Tech school leaders could do and citing the purported Victim Transfer Policy. Am. Compl. ¶ 78. But regardless of how the Brooklyn Tech dean characterized the procedure, this fact is still insufficient to show that the need to prevent such alleged constitutional deprivations was obvious to policymakers.

Even if the foregoing allegations sufficiently demonstrated that the City Defendants had knowledge of the alleged constitutional deprivations, Plaintiff still fails to plead a pattern of constitutional violations that is necessary to demonstrate deliberate indifference for the same reasons discussed above. *See Connick*, 563 U.S. at 62.

Consequently, Plaintiff fails to plausibly allege *Monell* liability under a theory of widespread practice or failure to train. Accordingly, City Defendants' motion to dismiss Plaintiff's Seventh Cause of Action under Section 1983 is granted and this claim is dismissed.

**B. Liability of the City**

Plaintiff asserts her Seventh and Eighth Causes of Action against the City. *See* Am. Compl. ¶¶ 118-28. City Defendants argue that the City is separate from the NYC DOE and "the City 'cannot be liable for the acts of the NYC[]DOE or its employees.'" Mot. at 13 (quoting *Romero v. City of New York*, 839 F. Supp. 2d 588, 601 (E.D.N.Y. 2012)). Thus, because Plaintiff does not cite any facts as to the City, City Defendants argue that the claims against it must be dismissed. *Id.* at 13-14. Plaintiff does not contest City Defendants' argument. Opp'n at 8. The Court agrees. *See Romero*, 839 F. Supp. 2d at 601. Accordingly, City Defendants' motion to dismiss the City as a defendant is granted and the City is dismissed.

**C. Title IX Claims**

City Defendants move to dismiss Plaintiff's Eighth and Ninth Causes of Action based on the same argument from their First Motion to Dismiss: that Plaintiff's "Section 1983 claims subsume[] some or all of Plaintiff's Title IX claim." Mot. at 2; Reply at 9. In her Amended Complaint, Plaintiff alleges substantively the same Title IX claim. *Compare* Compl. ¶¶ 118-26*, with* Am. Compl. ¶¶ 124-32. The Court already addressed this argument in its Memorandum and Order and ruled that Plaintiff's Title IX claim "does not subsume her [Section] 1983 claim." *See* M&O at 10. Accordingly, City Defendants' motion to dismiss Plaintiff's Eighth and Ninth Causes of Action under Title IX is denied.

## CONCLUSION

For the foregoing reasons, City Defendants' Motion is granted in part and denied in part. City Defendants' Motion is granted insofar as Plaintiff's Seventh Cause of Action under Section 1983 is dismissed, and the City is dismissed as a defendant. City Defendants' Motion is denied insofar as it seeks to dismiss Plaintiff's Eighth and Ninth Causes of Action alleged against the Chancellor and NYC DOE.

SO ORDERED.

/s/_____
ORELIA E. MERCHANT
United States District Judge

April 21, 2026
Brooklyn, New York